# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### WAYCROSS DIVISION

CONNIE L. WINDHAM,

        Plaintiff,

    v.

WILLIAM P. BARR, in his official capacity
as Attorney General of the United States;
UNITED STATES DEPARTMENT OF
JUSTICE; and FEDERAL BUREAU OF
PRISONS,

        Defendants.[1]

CIVIL ACTION NO. 5:16-cv-83

## O R D E R

      This Title VII action is before the Court on Defendant William P. Barr's Motion for

Summary Judgment. (Doc. 60.) Plaintiff Connie L. Windham filed a response Brief in Opposition,

(doc. 63), and Defendant filed a Reply, (doc. 65). In this Title VII retaliation case, Plaintiff brings

claims of retaliatory transfer and retaliatory hostile work environment arising out of her

employment with the Federal Bureau of Prisons ("BOP") at Federal Correctional Institution Jesup

("FCI Jesup"). (See Doc. 1.) Defendant moves for summary judgment, arguing that certain

retaliatory transfer claims are barred by Plaintiff's failure to exhaust and that Plaintiff fails to

---

[1] The only proper party defendant in a Title VII action brought against the United States and its agencies is the head of the agency in which the alleged discriminatory acts occurred. 42 U.S.C. § 2000e-16(c). For suits involving the Department of Justice and the Federal Bureau of Prisons that proper party defendant is the Attorney General of the United States. See Mulhall v. Ashcroft, 287 F.3d 543, 550 (6th Cir. 2002); Lee v. Holder, No. 1:07-CV-2649-CC, 2009 WL 10670933, at *2 (N.D. Ga. Feb. 23, 2009). As William P. Barr is the current Attorney General, replacing Defendant Jeff Sessions, the Court **AUTHORIZES** and **DIRECTS** the Clerk of Court to **TERMINATE** Jeff Sessions as a Defendant and **SUBSTITUTE** William P. Barr, in his official capacity as Attorney General of the United States. Fed. R. Civ. P. 25(d). Moreover, given that William P. Barr is the only proper party, the United States Justice Department and Federal Bureau of Prisons are due to be **DISMISSED** from Plaintiff's action.

establish sufficient evidence, in light of the undisputed facts, to support her remaining retaliation claims. (Doc. 60.) Plaintiff contends, in response, that genuine issues of material fact remain as to whether Defendant retaliated against her and that summary judgment should thus be denied. (Doc. 63). As explained below, however, the Court finds that the evidence presented by Plaintiff in this case is not enough for a reasonable jury to find that Defendants retaliated against her within the meaning of Title VII. Thus, for the reasons which follow, the Court **GRANTS** Defendant's Motion for Summary Judgment. (Doc. 60.) The Court **DIRECTS** the Clerk of Court to enter summary judgment in favor of Defendant and to **CLOSE** this case.

## BACKGROUND

### I. Procedural History

On September 9, 2014, Plaintiff filed this action pursuant to the anti-retaliation provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). (Doc. 1.) Defendant moved to dismiss the Complaint, arguing that Plaintiff failed to exhaust her retaliation claims or otherwise plead an adverse employment action and that she failed to state any claims of gender discrimination. (Doc. 9.) Defendant also contended Plaintiff could not recover punitive damages as a matter of law. (Id.) After briefing on these issues, (docs. 15, 17, 21), the Court granted in part and denied in part Defendant's Motion. (Doc. 28.) In so doing, the Court found that Plaintiff had failed to exhaust her retaliation claim regarding denied overtime and that she had failed to plead a claim of gender discrimination; the Court also dismissed Plaintiff's punitive damages claim. (Id.) However, the Court found Plaintiff stated cognizable retaliation claims regarding alleged wrongful transfers and a hostile work environment. (Id.)

Discovery ensued thereafter and, following an extension of time, (docs. 36, 38, 40, 42), ended on May 4, 2018. During the discovery period, the parties entered a Stipulation by which

they limited the claims Plaintiff could bring. (See Doc. 44.) The parties stipulated that claims arising from Paragraph thirty-seven of Plaintiff's Complaint, which concerns Defendant's alleged failure to promote or hire Plaintiff to several positions at FCI Jesup, (doc. 1), were withdrawn and dismissed without prejudice. (Id.) Further, the parties agreed that Plaintiff would not introduce evidence regarding Paragraph thirty-seven or the events described in BOP Agency Case No. 2016-0920, an internal discrimination dispute involving Plaintiff. (Id.; see also doc. 65-1 (BOP case file).) On July 19, 2018, Defendant filed his Motion for Summary Judgment. (Doc. 60.)

## II.    Factual Background

The material facts in this case are not in dispute. (See Doc. 63 ("Plaintiff does not oppose Defendant's recitation of the facts in its Brief in Support of Motion for Summary Judgment.").) Plaintiff Connie L. Windham is a BOP employee who has worked her entire tenure at FCI Jesup. (Doc. 60-21, p. 1.) Plaintiff began her career as a correctional officer but later took a position in UNICOR, a government corporation with two factories at FCI Jesup that primarily produce garments. (Id.) The larger of the two factories, the FCI Factory, produces t-shirts, while the smaller factory, the FSL Factory, produces specialty items with embroidery or screen prints. (Id. at p. 2.) These factories are located approximately 300 to 400 yards from each other, and according to Plaintiff, UNICOR employees do not generally view one factory as better than the other. (Id.; see also doc. 60-1, p. 20 (Plaintiff's Dep.).)

Plaintiff's first UNICOR position was as a customer service representative, which required her to take orders and ensure timely delivery. (Doc. 60-21, p. 2.) She began her customer service position working at the FCI Factory but later worked out of the FSL Factory. (Id.) Plaintiff made this move between factories based on an oral instruction, without any documenting paperwork. (Id.; doc. 60-1, p. 17.) In January 2013, Plaintiff became a UNICOR quality assurance specialist,

initially located at the FCI Factory. (Doc. 60-21, p. 2.) When she applied for this position, it did not matter to her whether she worked out of the FCI or FSL Factory.[2] (Id.) As a quality assurance specialist, Plaintiff ensured that manufactured garments met specifications and tolerance levels required by the customer. (Id. at p. 3.)

Although each factory had its own manager, Plaintiff reported to Robert Cousson, the quality assurance manager, rather than the factory manager. (Id.) Moreover, the factory manager did not participate in performance reviews of Plaintiff or make decisions regarding her pay. (Id.) In November 2013, Paul Wells served as the FCI Factory manager where Plaintiff worked as a quality assurance specialist. (Id.) Mr. Wells was not Plaintiff's supervisor. (Id.) At that time, Plaintiff and Mr. Wells were friends, and prior to being factory manager, he helped Plaintiff learn the duties of her new quality assurance job. (Id.)

That same month, an Equal Employment Opportunity ("EEO") investigator contacted Plaintiff regarding a discrimination complaint filed by Mr. Ricky Pasley, a UNICOR fabric worker who reported directly to FCI Factory Manager Wells. (Id. at pp. 3–4.) Jackie Butcher, a human resources manager, and later Mr. Wells, told Plaintiff that she should try and speak with the investigator. (Id.) On November 14, 2013, Plaintiff contacted the investigator by phone and first learned that the compliant pertained to Mr. Pasley. (Id. at p. 4.) Mr. Wells did not inform Plaintiff who the subject of the complaint was. (Id.) After speaking with the EEO investigator, Plaintiff never revealed the substance of her testimony to anyone at UNICOR. (Id.)

On November 18, 2013, Plaintiff and Mr. Wells were involved in two disputes. (Id. at pp. 4–5.) First, Plaintiff protested Mr. Wells' decision to change the overtime schedule and allow another worker to earn overtime instead of her; as a result of this change Plaintiff had to work

---

[2] Notably, while working in her customer service position, Plaintiff had previously volunteered, and expressed a preference, to be moved from the FCI Factory to the FSL Factory. (See Doc. 60-1, pp. 17–18.)

overtime the next day.[3] (Id. at p. 4.) Second, Mr. Wells separately confronted Plaintiff about a conversation Plaintiff had with Captain Carrino where she expressed concern that UNICOR employees were not performing security pat-downs of all inmates who came in and out of UNICOR factories. (Id. at p. 5.) According to Plaintiff, Mr. Wells questioned her in an intimidating manner and told her "what happens in UNICOR stays in UNICOR." (Id.)

On November 19, 2013, Jodi Thomason, the president of the union to which Plaintiff belongs, sent Mr. Wells an email contending that he had "verbally reprimanded [Plaintiff] to the point of her becoming physically and visibly shaken." (Id. (citation omitted).) Ms. Thomason alleged that Mr. Wells had retaliated against Plaintiff and announced the union would be pursuing a grievance. (Id.) After receiving this email, Mr. Wells called Plaintiff and asked that she explain to the Warden that Ms. Thomason's allegations were untrue; Plaintiff interpreted this call as an attempt to "coerce" her. (Id.) Plaintiff then authored a memo dated November 20, 2013, to FCI Jesup's Warden, Suzanne Hastings, outlining her recent interactions with Mr. Wells. (Id.; see also doc. 60-6 (Plaintiff's Mem.).) In response, Warden Hastings assembled a Threat Assessment Team to interview the relevant witnesses and make appropriate security recommendations.[4] (Doc. 60-21, p. 6.) The Team determined that Mr. Wells did not pose an imminent physical danger to Plaintiff, but they nonetheless recommended that he be reassigned to work in the UNICOR warehouse until further notice. (Id.) On November 21, 2013, Warden Hastings reassigned Mr. Wells, and he did not return to work at either Factory. (Id.)

---

[3] In the Court's Order dated June 27, 2017, the Court dismissed Plaintiff's retaliation based on this alleged denial of overtime, finding that Plaintiff had failed to timely exhaust this claim. (Doc. 28, p. 6.)

[4] The BOP and FCI Jesup have an express policy against workplace retaliation against those who engage in protected activity, and they have protocols to report and remedy such complaints. (Doc. 60-17 (BOP Program Statement on Discrimination and Retaliation Complaints Processing).)

## A.    Plaintiff's Transfers

Mr. Wells' relocation to the warehouse created an open position at the FCI Factory, as it left the factory without a manager.  (Id.)  Marvin Tucker, the Associate Warden who oversaw UNICOR and was Plaintiff's second-level supervisor, determined that Plaintiff's direct supervisor, Quality Assurance Manager Cousson, should be the new manager at the FCI Factory.  (Id.)  Mr. Cousson had previously served as the FCI Factory manager, and Associate Warden Tucker valued this experience, thinking it would be key in the factory maintaining necessary certifications.[5]  (Id. at pp. 6–7.)  At the time of relocation, Mr. Cousson was also as the quality assurance specialist at the FSL Factory, and his move to the FCI Factory created an opening at his previous position.  (Id. at p. 7.)  On December 31, 2013, Associate Warden Tucker notified Plaintiff that she would move from the FCI Factory to the FSL Factory on January 8, 2014, to coincide with Mr. Cousson's move; Mr. Tucker was unaware of Plaintiff's November 14, 2013 phone interview with the EEO investigator.  (Id.)  Following this move, Plaintiff emailed her supervisor to tell them that she "would like to stay at the FSL [Factory]."  (Doc. 60-10.)

Shortly thereafter, though, Warden Hastings asked Plaintiff to return to the FCI Factory on January 13, 2014.  (Doc. 60-21, p. 7.)  Warden Hastings did not disclose her rationale for transferring Plaintiff a second time, but she, like Associate Warden Tucker, was unaware that Plaintiff had provided a statement to an EEO investigator regarding Mr. Pasley's discrimination complaint.  (Id.)  Moreover, Plaintiff does not believe the January 13, 2014 transfer was retaliatory in manner.  (Id.)  Plaintiff's return to the FCI Factory on January 13 once again left the FSL Factory without someone to perform quality assurance functions.  (Id.)  This transfer back to the FCI

---

[5] Associate Warden Tucker also testified that "[a]t most multi-factory UNICOR locations the QA manager is assigned to the larger or more complex operation while the QA Specialist is assigned to the smaller factory."  (Doc. 60-2, p. 6.)

Factory was short lived, however, because on January 21, 2014, Plaintiff was once again transferred to the FSL Factory. (Id. at p. 8.) Plaintiff is unaware of the reasoning behind her January 21 transfer back to the FSL Factory or who made the decision, and no paperwork is associated with any of her January 2014 transfers between the two UNICOR factories at FCI Jesup. (Id.) However, Plaintiff acknowledges that the January 13, 2014 transfer back to the FCI Factory left the FSL Factory without a quality assurance staff member. (Doc. 60-1, p. 69.) Although Defendant transferred Plaintiff between UNICOR factories three times in January, she never experienced a change in pay, job responsibilities, or prestige. (Doc. 9-2, p. 3.) On March 3, 2014, Plaintiff first contacted the EEO office to file a complaint about these transfers. (Doc. 60-14.)

### B. Derogatory Comments Made About Plaintiff

In addition to Mr. Wells' intimidating questioning and the January transfers, both of which occurred relatively soon after Plaintiff's November 14, 2013 phone interview with the EEO investigators, Plaintiff also became the subject of several derogatory comments, per her November 20, 2013 memorandum to Warden Hastings. (Doc. 60-21, p. 8.) According to Plaintiff's memo, a co-worker, Lisa Ognilla, relayed to her that the "good ole boy's club" called her "The Gestapo." (Id.; see also doc. 60-6 (Plaintiff's Mem.).) Ms. Ognilla did not reveal who called Plaintiff "The Gestapo," and it was reportedly only used once according to Plaintiff.[6] (Doc. 60-21, p. 8.) In her memo, Plaintiff also stated that Ms. Ognilla reported a co-worker had referred to Plaintiff as an "unhappy camper," but Ms. Ognilla denied ever hearing anyone refer to Plaintiff as an "unhappy camper." (Id.) In either event, no one ever used the term "unhappy camper" in Plaintiff's presence. (Id.) Responding to Plaintiff's memo, Warden Hastings directed Associate Warden Tucker to hold

---

[6] To be sure, Ms. Ognilla testified to an EEO investigator that she heard the term "Gestapo" used "a few times" in reference to Plaintiff. (Doc. 63-2, p. 6.)

a meeting with all UNICOR staff, where he emphasized professionalism and demanded that all name-calling cease.[7]  (Id. at pp. 8–9.)

The name-calling brought to light by Ms. Ognilla was not the only negative thing in regard to Plaintiff.  Additionally, FSL Factory manager Wanda Moody made two derogatory remarks toward Plaintiff.  First, on March 24, 2014, Ms. Moody commented that Plaintiff was "not worried about OT on her check; she is just happy to make her 40-hour work week, 80-hour pay period." (Id. at p. 9.)  Plaintiff took this remark as disparagement on the number of absences she had accrued at that time.  (Id.)  Second, on April 1, 2014, Ms. Moody entered Plaintiff's office and handed her a whistle, stating "a whistle for a whistleblower," in the presence of inmates and Mr. Pasley.  (Id. at p. 10; doc. 60-1, pp. 87–88.)  Ms. Moody then said, "I guess that sounded funny . . . I didn't mean it."  (Id.)  Immediately following this incident, Warden Hastings issued Ms. Moody a cease and desist letter regarding her whistleblower stunt.  (Id.)  However, as far as Plaintiff knew, Ms. Moody was not aware that Plaintiff had given a statement to the EEO investigator when she made her comments to Plaintiff.  (Id. at p. 9.)

After being subjected to the aforementioned events, Plaintiff filed a claim for Workers' Compensation under the Federal Employees' Compensation Act ("FECA") based on the anxiety and mental anguish caused by these events.  (See id. at p. 10.)  Plaintiff also updated her March 2014 EEO complaint with information regarding Ms. Moody's actions and derogatory comments. (Doc. 60-14.)  In her April 2015 application for FECA benefits, Plaintiff stated that she had been diagnosed with "adjustment disorder" brought on by working in a "hostile work environment" at UNICOR.  (Doc. 60-19.)  On September 21, 2015, the Office of Workers' Compensation Programs

---

[7]  In addition, a co-worker named Sean Greene called Plaintiff "LT" occasionally, but Plaintiff had been helpful to Mr. Greene when he first began working at FCI Jesup, and she believes Mr. Green called her "LT" because of her help, not out of disrespect.  (Doc. 60-21, p. 9.)

approved Plaintiff's claim for benefits. (Doc. 60-21, p. 10.) Approximately one year later, on September 14, 2016, Plaintiff filed the present Title VII retaliation action. (Doc. 1.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d

1346, 1353 (11th Cir. 2011) (citing <u>Rodriguez v. Sec'y for Dep't of Corr.</u>, 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts."  <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  <u>Id.</u> (citation and emphasis omitted).

### DISCUSSION

Plaintiff Windham claims that Defendant subjected her to unlawful retaliation at FCI Jesup in violation of Title VII.  (Doc. 1.)  Title VII makes it illegal for "an employer to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); <u>King v. Sec'y, United States Dep't of the Army</u>, 652 F. App'x 845, 847 (11th Cir. 2016) (per curiam) (noting that Title VII's prohibition on retaliation applies to federal employees).  Plaintiff's retaliatory transfer and hostile work environment claims arise under the second clause of this section, known as the "participation clause."  <u>EEOC v. Total Sys. Servs.</u>, 221 F.3d 1171, 1174 (11th Cir. 2000).  The participation clause "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC."  <u>Id.</u> (citation omitted).

Plaintiff alleges that, after she participated in an EEO investigation, Defendant retaliated against her by transferring her between different UNICOR factories at FCI Jesup and by subjecting her to a hostile work environment.  (Doc. 63; <u>see</u> doc. 1.)  Plaintiff assets that "[i]mmediately after

[she] testified" in the investigation on November 14, 2013, "Defendant engaged in a pattern of retaliatory acts and comments which would dissuade a reasonable employee from testifying." (Doc. 63, p. 11.) Plaintiff argues that the "totality of the circumstances" show Defendant retaliated against her and that, at the very least, "[g]enuine issues of material fact exist as to why Defendant took these against Plaintiff." (Id. at pp. 10, 11.) Further, Plaintiff avers that a dispute remains as to whether Defendant's actions "were sufficient to dissuade a reasonable employee from testifying in support of a co-worker in his race discrimination case." (Id. at p. 14.)

Defendant moves for summary judgment as to Plaintiff's claims of retaliatory transfer and retaliatory hostile work environment. (Doc. 60.) Defendant argues that Plaintiff's claims regarding the transfers on January 8 and 13, 2014, are barred by Plaintiff's failure to timely exhaust those claims. (Id. at pp. 10–11.) As to her January 21, 2014 transfer, Defendant contends Plaintiff has not adduced the necessary evidence to support a prima facie case of retaliatory transfer and that Plaintiff was transferred for legitimate business reasons, not retaliation. (Id. at pp. 12–19.) Similarly, Defendant argues that Plaintiff fails to produce evidence of a retaliatory hostile work environment and that the BOP took prompt remedial action, thereby precluding liability. (Id. at pp. 20–26.) In addition, Defendant asserts that Plaintiff may not obtain compensatory damages stemming from her adjustment disorder diagnosis, because she has already been compensated for this harm thorough her successful FECA claim. (Id. at pp. 26–30.)

The Court address these arguments in turn. In reviewing the undisputed facts in this case and the evidence submitted by Plaintiff on each of her retaliation claims, the Court finds that Defendant's Motion for Summary Judgment is due to be granted for the reasons explained below.

## I.       Plaintiff's New & Unsupported Allegations Presented in her Opposition Brief

The Court begins by discussing the new factual allegations and non-sequitur arguments raised by Plaintiff in her Opposition Brief.   Rather than directly engaging with many of Defendant's arguments, Plaintiff's Brief in Opposition mostly passes by Defendant's Motion for Summary Judgment much like two ships passing in the night.  (Compare Doc. 60, with Doc. 63.) In her Brief, Plaintiff fails to respond to Defendant's exhaustion argument, as well as others, and fails to muster evidence on issues where Defendant has contended there is insufficient evidence to survive summary judgment.  (See Docs. 60, 63; see also doc. 65, pp. 18–19 n.3 (outlining several arguments Plaintiff failed to address).)  Instead, as Defendant accurately illustrates, Plaintiff relies in-part on hearsay evidence, raises factual contentions that exceed the scope of her Complaint *and* violate the parties' Stipulation, points to evidence that does not support her assertions, and attempts to change the relevant protected activity undergirding her retaliation claims from the November 2013 statement to other events.  (See Doc. 65, pp. 1–8.)  Plaintiff did not file a surreply to rebut these charges made by Defendant.  In the manner and for the reasons explained below, the Court declines to consider Plaintiff's extraneous and unsupported factual allegations and the arguments made thereunder

### A.       Inadmissible Evidence

Pursuant to Federal Rule of Civil Procedure 56(c)(2), Defendant objects to Plaintiff's use of an email she sent to herself documenting the conversations of others as inadmissible hearsay. (Id. at p. 2.)  Under this rule, "[a] party may object that material cited to support or dispute fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2); see Campbell v. Shinseki, 546 F. App'x 874, 879 (11th Cir. 2013) (per curiam) (explaining that a party may oppose the admissibility of evidence at summary judgment without filing a separate motion).

In her Opposition Brief, Plaintiff cites the email as support for her claim that "[o]n August 18, 2014, [Associate] Warden Tucker asked Ricky Pasl[e]y, the employee for whom Plaintiff had testified, whether he was assisting Plaintiff with her EEO case." (Doc. 63, p. 7 (citing doc. 63-6).)

The email, dated August 22, 2014 and sent by Plaintiff to Plaintiff, concerns events which took place four days prior on August 18, 2014. (See Doc. 63-6.) It states:

> On Monday, August 18, 2014, Wanda Moody reported to [Associate Warden] Tucker that I was working on [m]y EEO Case in Unicor Factory. Mr. Tucker called Pasley to ask him if he was assisting me on my case and that it should be UNION Official time if we were working on my EEO Case. Mr. Pasley informed Mr. Tucker that I was not working on my case nor was he assisting me on my case. He stated that I was working on quality issues. . . . I happened to be working on the table inside where Mr. Pasley uses the computer. I had a file folder so she assumed I was working on my EEO case. The bigger question is how does she know I have a[n] EEO case???????

Id. Relying on this email and information from Associate Warden Tucker's affidavit by interrogatory, (doc. 60-2), Plaintiff concludes that Mr. Tucker was aware of her protected activity at the relevant time of her transfers.[8] (See Doc. 63, pp. 6–7.)

Defendant contends that Plaintiff relies on her email to herself for the truth of the matter asserted and that it must be excluded, because it does not fall under any hearsay exception, such as for business records of regularly conducted activity, and because it is not probative for non-hearsay purposes, such as the state of mind of its recipient. (Doc. 65, p. 2 (citing Fed. R. Evid. 801(c), 802, 803(6).) Defendant also argues the email does not establish Plaintiff's personal knowledge of the conversations it recounts. (Id.) The Court agrees.

To the extent Plaintiff relies on this email as substantive proof that on August 18, 2014, Associate Warden Tucker spoke with Mr. Pasley about her, it is inadmissible hearsay. Likewise,

---

[8] In actuality, Associate Warden Tucker's affidavit by interrogatory, dated July 30, 2014, does not indicate whether, and if so when, he had knowledge of Plaintiff's November 2013 protected activity of speaking with the EEO investigator in Mr. Pasley's case. (See Doc. 60-2.)

to the extent Plaintiff relies on this email as evidence of the details of that conversation, it is inadmissible hearsay. Plainly, the email is an out-of-court statement, "offer[ed] in evidence to prove the truth of the matter asserted in the statement," Fed. R. Evid. 801(c), that Mr. Tucker and Mr. Pasley had a conversation on August 18, 2014, regarding Plaintiff's EEO case. As such, it is inadmissible hearsay. Moreover, Plaintiff does not endeavor to argue that this email should be admitted under a hearsay exception or exclusion. See Fed. R. Evid. 801(d), 803. Additionally, Plaintiff does not attempt to explain how this evidence could be presented as admissible evidence at trial. Thus, while Plaintiff may testify as to her personal knowledge of these events, she may not rely on this email as proof that they transpired as stated in the email. Accordingly, the Court declines to consider this email when determining whether Plaintiff has adduced evidence showing Associate Warden Tucker was aware of her protected activity.

### B.     Unsupported Assertions

Defendant takes issue with the support offered in favor of two factual assertions made by Plaintiff in her Brief. (Doc. 65, p. 3.) First, Plaintiff alleges that Ms. Ognilla "heard employees calling Plaintiff names such as 'Gestapo,' 'unhappy camper,' and 'LT' a few times.'" (Doc. 63, p. 3 (citing doc. 63-2, pp. 6–7 (transcript of Ms. Ognilla's interview with an EEO investigator).) In her statement to the EEO investigator, however, Ms. Ognilla does not mention "LT" or "unhappy camper" as names people called Plaintiff; she only mentions overhearing "Gestapo" a few times. (Doc. 63-2, p. 6.) In fact, Ms. Ognilla expressly disclaims ever hearing anyone call Plaintiff an "unhappy camper." (Id.) Accordingly, when assessing whether Plaintiff was subjected to a retaliatory hostile work environment, the Court excludes consideration of the alleged "unhappy camper" comment as there is no competent proof on this point. See Fed. R. Civ. P. 56(c)(1)(A) (factual assertions must be supported by record cites); Local R. 7.1(b) ("Every factual

assertion in a motion, response, or brief shall be supported by a citation to the pertinent page in the existing record or in any affidavit, discovery material, or other evidence filed with the motion.").

Second, Plaintiff asserts that she "was required to provide additional medical information to support her leave," which deviated from Defendant's routine procedure. (Doc. 63, p. 10.) Plaintiff cites nothing in support of this assertion here; however, in response to Defendant's Motion to Dismiss, Plaintiff offered her own affidavit which this assertion parrots. (See Doc. 15, p. 15.) Nevertheless, Plaintiff does not offer any documentary support for this assertion or any relevant details, such as when she took leave and what additional medical information Defendant required. Moreover, as shown by Defendant in its earlier Reply to Plaintiff on this issue, the BOP followed its policy, which requires those on leave to "periodically update the supervisor as to ability to return to work," and the BOP may "require the employee to submit a medical certificate or other administratively acceptable evidence." (Doc. 17, p. 8 (quoting doc. 17-6 (BOP Sick Leave Policy Agreement)).) Because Plaintiff offers no evidence of record as to how Defendant violated its sick leave policy when seeking additional medical information, the Court declines to consider Plaintiff's conclusory allegation in this regard. See Fed. R. Civ. P. 56(c)(1)(A); Local R. 7.1(b).

C.   **New Allegations**

(1)   **Plaintiff's Change of Jobs in 2015 & 2018**

Throughout her Brief in Opposition, refers to allegations that she was removed from her UNICOR position in October 2015 and "when Plaintiff applied to return to her previous job, less qualified and less experienced individuals were selected instead." (Doc. 63, pp. 4–5; see also id. at pp. 10 ("passed over for a promotion"), 12 (Plaintiff "applied three times to return [to UNICOR]" but "Defendant passed over her"), 14 (Defendant "threaten[ed] to abolish her job" and "trasnferr[ed] her to picking up cardboard"). Defendant submits four reasons why the Court should

not accept any allegations or argument concerning her removal from UNICOR in October 2015 and Defendant's failure to hire her when she applied to return: (1) the allegations exceed the scope of Plaintiff's Complaint and Defendant was not on notice of them; (2) the allegations violate the parties' Stipulation; (3) the allegations are not ripe because they were not exhausted; and (4) the allegations lack evidentiary support and are insufficient to support a prima facie retaliation claim. (Doc. 65, pp. 3–5.) Again, Plaintiff does not rebut any of these charges.

As is typical of Plaintiff's Brief in Response, she is not clear as to what specific "previous job" she applied to return to or when she did so, and she does not identify who was selected and how he or she was less qualified. (See Doc. 63, pp. 4–5.) Plaintiff seems to conflate the three January 2014 transfers, which she did not apply for, with other job opportunities at FCI Jesup that she did apply for but was not selected:

> Plaintiff was transferred three times within two months of her protected activity. Plaintiff had six years of experience in UNICOR at that time, but was not returned to her previous job, even though Defendant continued to hire employees to work there. Defendant contends that there were legitimate business reasons for the transfers, stating that because Robert Cousson had previous experience as manager, he was selected for factory manager, however when Plaintiff applied to return to her previous job, less qualified and less experienced individuals were selected instead. (Job announcements and placements, Ex. D, attached hereto) Plaintiff was finally returned to her previous job on May 4, 2018, and in fact received a promotion. (Ex. D, attached hereto) If she was qualified on that date, she was always qualified. The only change in her qualifications since her first transfer is that she is now also qualified in Food Service. Defendant states that all of Plaintiff's transfers were between factories, however this is not accurate. In October 2015 . . . Plaintiff was placed on loan to the Food Service Warehouse . . . . Plaintiff submits that this this transfer is one of the continuing violations in this case. On May 4, 2018, Plaintiff was finally selected to return to UNICOR . . . .

(Id.) In making these allegations, Plaintiff repeatedly cites the same collection of computer printouts with unattributed handwritten comments from what appears to be a BOP job portal. (See id. (citing doc. 63-5 (Exhibit D).) To the extent Plaintiff presents these allegations as proof Defendant retaliated against her when transferring her between FCI Factories in January 2014,

they are excluded as outside the scope of her Complaint and in violation of the parties' Stipulation.

"A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (citation omitted); see also Am. Fed'n of State, Cty. & Mun. Employees Council 79 v. Scott, 717 F.3d 851, 863 (11th Cir. 2013). Moreover, in a retaliation case, a plaintiff may not rely on unpleaded adverse actions at the summary judgment stage, even where those adverse actions were brought out in discovery. Brown v. Snow, 440 F.3d 1259, 1266 (11th Cir. 2006). Unless the plaintiff amends her complaint to include the unpleaded facts, the court is correct to not address those allegations at summary judgment. Id. Looking at Plaintiff's Complaint, filed on September 14, 2016, it is devoid of any mention of being required to work at the Food Service Warehouse in October 2015 or of being removed from work at UNICOR. (See Doc. 1.) What is more, the only retaliation allegations concern her transfer between the FCI and FSL Factories in January 2014 as well as the intimidation and name-calling that began shortly after her November 2013 protected activity. (Id. at pp. 9–10.) By failing to give Defendant fair notice of these facts in her Complaint, which ostensibly support her retaliation claims, they are not properly before the Court at summary judgment, and the Court declines to consider them in ruling on Defendant's Motion.

In addition, the parties stipulated and withdrew the claims arising from Paragraph thirty-seven of Plaintiff's Complaint, and they stipulated that neither these complaint allegations nor the allegations "described in [BOP] Agency Case No. 2016-0920" will be offered in evidence at any trial. (Doc. 44.) Paragraph thirty-seven states that "Plaintiff was 'mothballed' [from UNICOR] in November 2015, which means removed from her position and told that her position would be abolished. On June 23, 2016, Plaintiff was displaced from her position while Defendant was hiring other positions inside the UNICOR factory." (Doc. 1, p. 8.) BOP Agency Case No. 2016-0920

also pertains to her removal from UNICOR at FCI Jesup and Defendant's failure to hire her to other UNICOR positions. (See Doc. 65-1, pp. 2–3.) These claims concern Defendant's alleged failure to hire or promote Plaintiff to certain positions and were expressly excluded from this case by way of stipulation. (See Doc. 44.) Notably, in her Brief in Opposition, Plaintiff admits that her removal from UNICOR, where "[s]he was passed over for promotion," is "the subject of another EEO formal complaint," (doc. 63, p. 10), presumably Case No. 2016-0920.

The allegations concerning Plaintiff's October 2015 removal from her UNICOR position and placement at the Food Service Warehouse are clearly precluded by the parties' Stipulation. (See Doc. 44.) Plaintiff's present attempt to "introduce evidence [and allegations] regarding" Paragraph thirty-seven and Case No. 2016-0920 directly flouts what she stipulated to and will not be permitted. (See id. (prohibiting Plaintiff from introducing such evidence).) Because "parties are bound by their stipulations," G.I.C. Corp. v. United States, 121 F.3d 1447, 1450 (11th Cir. 1997) (citation omitted), the Court will not consider these allegations.

Thus, both because Plaintiff did not set forth allegations in her Complaint concerning her removal from UNICOR and subsequent placement at the Food Service Warehouse, and because Plaintiff stipulated that she not would pursue claims or introduce evidence relating to Defendant's alleged failure to hire or promote her, the Court declines to consider these allegations in determining whether Plaintiff had made out a prima face case of retaliation stemming from her January transfers and her hostile work environment claims.[9]

---

[9] Furthermore, even if these allegations were properly before the Court, they would fail on the merits for several reasons: Plaintiff fails to identify and offer proof of who the relevant decision makers were; what they knew regarding her protected activity; who the alleged comparators were; and what qualifications they had. See Loberger v. Del-Jen Inc., 616 F. App'x 922, 930–31 (11th Cir. 2015) (per curiam) (explaining required showing for a retaliatory failure to hire claim); Raney v. Vinson Guard Serv., 120 F.3d 1192, 1197 (11th Cir. 1997) (a plaintiff must generally establish that the defendant was aware of protected activity at time of adverse employment action). And the timing of her removal from UNICOR is too remote from Plaintiff's protected activity—occurring approximately two years later—to suggest retaliatory animus. See

## (2)    Plaintiff's Alternative Protected Activity

In what may be her most audacious attempt at recasting her retaliation claims through summary judgment response, Plaintiff seemingly submits a new series of protected activities that both look back to events occurring before her November 2013 testimony to the EEO investigator and look forward to events occurring after it. Under her section entitled "Third Element: Plaintiff's Protected Activity and the Adverse Action Were Not Wholly Unrelated," Plaintiff states that she "was labeled as a whistleblower because of her successful EEO complaint in 2011, her testimony for Rick Pasl[e]y, her complaint about his and her removal from the overtime list, her complaint about lack of security in the pat-down procedure, and her subsequent formal complaints." (Doc. 63, pp. 12–13.) Plaintiff does not specify what her subsequent formal complaints were or provide any record cites for these allegations. In her Complaint, however, Plaintiff clearly and consistently alleged that her November 14, 2013 testimony to an EEO investigator in Ricky Pasley's case was the subject protected activity. (See Doc. 1, pp. 4, 6, 9.) The Court proceeded under this theory in denying Defendant's Motion to Dismiss. (See Doc. 28, pp. 1, 4.)

To be sure, the balance of Plaintiff's Brief in Opposition treads this same path. (See Doc. 63, p. 6 (alleging her "protected activity" occurred on November 14, 2013, when she "testified on behalf of her co-worker"), p. 7 ("Plaintiff's protected activity on November 1[4], 201[3]"), p. 11 (Defendant retaliated "after Plaintiff testified for her co-worker").) This is the same path Plaintiff takes in her Complaint, and this is the path the Court will proceed down when determining whether Plaintiff has established a prima facie case of retaliation. See Roberson v.

---

Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) (noting "three to four month disparity" too remote to support causation). Finally, Plaintiff's "continuing violations" theory with respect to these later job transfers, (doc. 63, p. 5), has been expressly rejected by the Supreme Court. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002) (rejecting "continuing violations doctrine" as to discrete acts such as transfers and noting each discrete act is separately actionable and must be itself exhausted).

BancorpSouth Bank, Inc., No. CIV.A. 12-0669-WS-N, 2013 WL 6254108, at *12 (S.D. Ala. Dec. 4, 2013) (A plaintiff "cannot retool her [c]omplaint via summary judgment to state a difference species of retaliation claim." (citation omitted)); see also Lightfoot v. Henry Cty. Sch. Dist., 771 F.3d 764, 779 (11th Cir. 2014) (affirming district court's refusal to construe "retaliation claim as being based on different facts than the ones actually pled in her ADA count").

Accordingly, the Court declines to consider these new allegations of protected activity and, as Plaintiff laid out in her Complaint and much of her briefing in this case, will look to her November 14, 2013 testimony by phone to the EEO investigator as the predicate protected activity for her retaliation claims. Having dispensed with the extraneous and unsupported allegations made by Plaintiff in her Opposition Brief, the Court now turns to the merits of her retaliation claims, as set forth in her Complaint, in light of the undisputed evidence adduced by the parties.

## II. Plaintiff's Retaliatory Transfer Claim

### A. Legal Standard

"To make out a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in an activity protected under Title VII; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action." Kidd v. Mando Am. Corp., 731 F.3d 1196, 1211 (11th Cir. 2013) (citation omitted). Absent direct evidence of retaliation, a plaintiff must show a prima facie case of retaliation under the McDonnell Douglas burden-shifting framework. Crawford v. Carroll, 529 F.3d 961, 975–76 (11th Cir. 2008) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). Under this framework, once the plaintiff establishes a prima face retaliation case, the burden shifts and "the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action." Crawford, 529 at 976 (quoting Holifield v. Reno, 115 F.3d 1555, 1566 (11th Cir. 1997) (per curiam)). "If the employer

offers such legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation." Id. "Summary judgment is appropriate if the plaintiff fails to satisfy any one of the elements of a *prima facie* case." Adams v. City of Montgomery, 569 F. App'x 769, 773 (11th Cir. 2014) (per curiam) (citing Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1433 (11th Cir. 1998)). A plaintiff's burden at summary judgment, however, is not to show by a preponderance of evidence a prima facie case of retaliation; rather, it is to show enough evidence that would allow a reasonable jury to find in the plaintiff's favor on each element of a retaliation claim. See Raney, 120 F.3d at 1196–97.

In the context of transfers, a "reassignment of job duties is not automatically actionable." Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 71 (2006). To establish a transfer as a materially adverse action, a plaintiff must show that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 69 (citation and internal quotations omitted). Factors to consider in determining whether a transfer amounts to a materially adverse action include whether the new position is more arduous, carries greater prestige, or is considered an objectively better job by other employees. Id. at 71. Courts also consider whether the new position would involve any difference in "pay, hours, benefits, or duties." Adams, 569 F. App'x at 773 (citation omitted); see also Duble v. FedEx Ground Package Sys., Inc., 572 F. App'x 889, 895 (11th Cir. 2014) (per curiam) (considering change in salary and benefits and noting that a plaintiff's subjective impressions are generally irrelevant to whether an action was adverse (citing Doe v. Dekalb Cty. Sch. Dist., 145 F.3d 1441, 1452 (11th Cir 1998)).

"To establish a causal connection, a plaintiff must show that the relevant decisionmaker was 'aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" Kidd, 731 F.3d at 1211 (quoting Shannon v. BellSouth Telecomms., Inc.,

292 F.3d 712, 716 (11th Cir. 2002)). A plaintiff can meet this burden if "she provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action." Higdon, 393 F.3d at 1220; see also Jarvela v. Crete Carrier Corp., 776 F.3d 822, 832 (11th Cir. 2015) ("Temporal proximity alone is insufficient to establish a causal connection in the absence of knowledge by the employer." (citation omitted)). "But mere temporal proximity, without more, must be very close." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (citation and internal quotations omitted).

Moreover, the United States Supreme Court has held that "Title VII retaliation claims must be proved according to the traditional principles of but-for causation." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013). This standard requires proof that the plaintiff's "protected activity was a but-for cause of the alleged adverse action by the employer." Id. at 362. Thus, in showing causation under the prima face McDonnell Douglas framework, the plaintiff maintains "the burden of persuasion to 'proffer evidence sufficient to permit a reasonable fact finder to conclude that discriminatory animus was the 'but-for' cause of the adverse employment action.'" Smith v. City of Fort Pierce, 565 F. App'x 774, 778 (11th Cir. 2014) (per curiam) (quoting Sims v. MVM, Inc., 704 F.3d 1327, 1332 (11th Cir. 2013)).

**B.      Exhaustion of Plaintiff's Retaliatory Transfer Claims**

Before filing suit under Title VII, a federal employee must exhaust her administrative remedies so that the agency has "the information it needs to investigate and resolve the dispute between the employee and the employer." Crawford v. Babbitt, 186 F.3d 1322, 1326 (11th Cir. 1999) (citation and internal quotations omitted). As part of the exhaustion requirement, a plaintiff must "initiate contact with [an EEO] Counselor within 45 days of the date of the" wrongful act. 29 C.F.R. § 1614.105(a)(1). And when a plaintiff does not initiate contact within the 45-day

period, her claims are typically barred.  <u>Ramirez v. Sec'y, U.S. Dep't of Transp.</u>, 686 F.3d 1239, 1242 (11th Cir. 2012).

Defendant argues that, because Plaintiff did not contact the EEO until March 3, 2014, any events occurring prior to January 17, 2014 are barred.  (Doc. 60, p. 11.)  Thus, Defendant concludes, [a]ny retaliation claims [Plaintiff] may have related to the January 8 and 13, 2014 transfers between the FCI Factory and the FSL Factory are [] time barred."  (<u>Id.</u>)  To the extent Plaintiff claims these earlier transfers are related to her January 21, 2014 transfer, Defendant argues they are "discrete discriminatory acts" which are precluded even if related to timely filed charges. (<u>Id.</u>)  Plaintiff does not respond to this argument in her Brief.  (<u>See</u> Doc. 63.)  As such, Defendant contends Plaintiff has conceded that these transfers were unexhausted and thus precluded. (Doc. 65.)

Regardless of Plaintiff's failure to respond to Defendant's exhaustion argument, the Court finds that the undisputed evidence shows Plaintiff failed to properly grieve and exhaust her retaliation claims stemming from the January 8 and 13, 2014 transfers.  In her response Brief, Plaintiff does not point to any earlier contact with the EEO office, and in fact, only references the March 3, 2014 contact.  (<u>See</u> Doc. 63, p. 2.)  Plaintiff also incorporated the exhibits attached to her earlier response in opposition to Defendant's Motion to Dismiss, (<u>id.</u> at p. 1), which only include the forms documenting her March 3, 2014 contact with the EEO office, (doc. 21, pp. 9–10; <u>see also</u> doc. 60-14).  The Court, moreover, has previously found that Plaintiff "does not dispute that she did not contact the EEO office until March 3, 2014."  (Doc. 28.)

A transfer is a "discrete act" of discrimination under Title VII whereby "each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" <u>Nat'l R.R. Passenger Corp.</u>, 536 U.S. at 114.  "Discrete discriminatory acts are not actionable if

time barred, even when they are related to acts alleged in timely filed charges.  Each discrete act starts a new clock for filing charges alleging that act."  Id. at 113.  As a result, "only events that took place within the timely filing period are actionable."  Id. at 114.  Because Plaintiff did not contact the EEO office until March 3, 2014, her retaliatory transfer claims regarding the January 8 and 13, 2014 transfers between UNICOR factories are barred as a matter of law.  See Tarmas v. Sec'y of the Navy, 433 F. App'x 754, 760–61 (11th Cir. 2011) (per curiam) (actions that occur outsider 45-day window are untimely).  Based on her March 3 EEO filing, Plaintiff's actionable window extended back 45 days to January 17, 2014, and her transfers on January 8 and 13, 2014, clearly predate this timely filing period.  Accordingly, the Court finds that Plaintiff did not timely grieve and exhaust her retaliation claims related to these two transfers, and thus, she may not pursue them here.

### C. Whether Plaintiff Establishes a Prima Facie Retaliation Claim Based on the January 21, 2014 Transfer to the FSL Factory

The only challenged transfer properly before the Court is Plaintiff's January 21, 2014 transfer from the FCI Factory back to the FSL Factory.  Defendant argues this transfer does not rise to the level of an adverse action, is not causally related to Plaintiff's protected activity, and was supported by legitimate business reasons.  (Doc. 60, pp. 12–18.)  Defendant also asserts that Plaintiff cannot show the BOP's reasons for her transfer were pretext for retaliation.  (Id. at pp. 18–19.)  In response, Plaintiff disagrees and contends that the timing of this transfer, along with the fact that it took her away from the factory where her expertise was needed, establish a prima facie case of retaliation.  (Doc. 63, pp. 8–13.)  It is undisputed that Plaintiff's November 14, 2013 telephonic statement to the EEO investigator constituted protected activity.  (See Doc. 60, p. 12.)  Accordingly, the Court determines whether Plaintiff has adduced sufficient evidence to meet her

prima facie burden to establish the transfer as an adverse employment action and to show causation between the transfer and her protected activity.

### (1) Plaintiff Fails to Establish That her Transfer to the FSL Factory on January 21, 2014 Constituted an Adverse Employment Action

As recounted in the Background above, on January 21, 2014, Plaintiff was transferred between factories for a third time in the span of two weeks; this time from the FCI Factory to the FSL Factory. These two factories are approximately 300 to 400 yards from each other, and UNICOR employees do not generally consider one factory more desirable to work at than the other. When Plaintiff initially applied to be a UNICOR quality assurance specialist it did not matter to her which factory she was placed at. After her first transfer to the FSL Factory, on January 8, 2014, Plaintiff emailed her supervisors to express a preference to stay at the FSL Factory. What is more, earlier in her career at FCI Jesup, while working as a customer service specialist, Plaintiff volunteered and expressed a preference to work at the FSL Factory over the FCI Factory. Most tellingly, however, is that Plaintiff experienced no loss of pay, change in job responsibilities, or diminution in job prestige while transferring between the neighboring UNICOR factories at FCI Jesup.

Against this undisputed evidence, Plaintiff makes very little showing that her transfer to the FSL Factory on January 21, 2014, was an adverse employment action, *i.e.* it was "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 57. In conclusory fashion, Plaintiff states that the "actions by Defendant in this case meet [the adverse action] test," (doc. 63, p. 12), without at all attempting to proffer evidence which shows that her transfer from the FCI Factory to the FSL Factory was a materially adverse action. Moreover, in view of the undisputed facts, Plaintiff fails to explain why a reasonable employee in her position would consider relocation between nearby

factories, while holding the same job with the same responsibilities and pay, to be materially adverse.

At best, Plaintiff contends the January 21, 2014 transfer was materially adverse because it led to her work-related adjustment disorder diagnosis by a psychologist. (See id. at pp. 10–11.) But this evidence is of little consequence here because "[t]he materiality of the alleged adverse action is judged by an objective standard." Foshee v. Ascension Health-IS, Inc., 384 F. App'x 890, 892 (11th Cir. 2010) (per curiam) (citing Burlington, 548 U.S. at 68). Plaintiff also fails to grapple with the four analogous Eleventh Circuit decisions cited by Defendant, where the Court of Appeals found transfers to similar positions with the same compensation were not materially adverse. (Compare Doc. 60, pp. 13–14 (citing, inter alia, Duble, 572 F. App'x at 895, and Adams, 569 F. App'x at 773), with doc. 63 (citing no cases that discuss whether a job transfer is an adverse action); see also doc. 65, p. 15.)

Based on the undisputed evidence presented by the parties, and viewing such evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff fails to establish her transfer to the FSL Factory on January 21, 2014, was a materially adverse employment action. Not only had Plaintiff twice expressed a preference to work in the FSL Factory as compared to the FCI Factory, her transfer to the FSL Factory did not alter her pay or job duties. See Duble v. FedEx Ground Package Sys., Inc., 572 F. App'x 889, 895 (11th Cir. 2014) (per curiam) ("lateral move [that] did not involve a loss in salary or benefits" not a materially adverse employment action, despite the plaintiff's allegations that it "greatly" inconvenienced him); Adams, 569 F. App'x at 773 ("denial of a transfer that would involve driving a larger truck, but not involve any difference in pay, hours, benefits, or duties" not a materially adverse employment action). Further, a position at the FSL Factory was not considered to be less desirable or less prestigious than a position at the FCI

Factory.  Cf. Burlington, 548 U.S. at 68 (concluding a jury could find a reassignment of job responsibilities was materially adverse to a reasonable employee where it led to more arduous work and was considered a worse position with less prestige).  Accordingly, because Plaintiff does not establish that her January 21, 2014 transfer was a materially adverse employment action—a required element of a prima facie retaliation case—her claim for retaliatory transfer necessarily fails, and summary judgment is due for Defendant as to this claim.  See Adams, 569 F. App'x at 773 (summary judgment appropriate on retaliation claim where the plaintiff fails to satisfy any one of the elements of a prima face case).

### (2)    Plaintiff Fails to Establish a Causal Relationship Between her Statement to the EEO Investigator and her January 21, 2014 Transfer

In the interest of completeness, the Court discusses Plaintiff's additional failure to adduce evidence sufficient to support a prima facie retaliation case with respect to causation.  Although this transfer was in relatively close temporal proximity to her November 14, 2013 protected activity—occurring approximately two months later—this evidence alone is not sufficient to establish a prima facie retaliation case where there is no corresponding evidence that the decision maker who directed the transfer was unaware of the protected activity.  Williams v. Waste Mgmt., 411 F. App'x 226, 229–30 (11th Cir. 2011) (per curiam) (two-month gap between protected activity and alleged retaliation not "very close" and thus not sufficient to establish a prima facie case without more); see also Jarvela, 776 F.3d at 832 ("Temporal proximity alone is insufficient to establish a causal connection in the absence of knowledge by the employer." (citation omitted)).  Plaintiff must "provide[] sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action."  Higdon, 393 F.3d at 1220.  She has not done so here.

By her own admission, Plaintiff is not sure exactly who decided she would transfer to the FSL Factory on January 21, 2014. In her Local Rule 56.1 statement of material facts, Plaintiff does not dispute that Warden Hastings and Associate Warden Tucker were the relevant decision makers for purposes of her retaliation claims, but Plaintiff admits that neither individual knew she gave a statement to an EEO investigator regarding Mr. Pasley's discrimination complaint. (Compare Doc. 60-21, pp. 6–7, with doc. 63-7, pp. 5–6.) Under Local Rule 56.1, "[a]ll material facts set forth in the [fact] statement required to be severed by the moving party will be deemed to be admitted unless controverted by a statement served by the opposing party." Despite this admission, Plaintiff nonetheless argues in her Brief that both Warden Hastings and Associate Warden Tucker knew of her protected activity. (Doc. 63, pp. 11–12.) Her arguments are without substance or evidentiary support, and the Court dispenses with them on the merits.

Plaintiff argues both Ms. Hastings and Mr. Tucker were aware of her protected activity based on a call from the EEO investigator to her "supervisor to locate her in order to obtain her testimony." (Id. at p. 6 (citing doc. 15, p. 19 (Exhibit C)); see also id. at p. 11 (same).) It is not clear to whom Plaintiff refers in using the term "supervisor," and the evidence she cites in support of this allegation does reference a phone call with a supervisor. Instead, Exhibit C shows that her human resources manager, Ms. Butcher, emailed Plaintiff requesting that she contact the EEO investigator. (See Doc. 15, p. 19.) There is no evidence that Ms. Butcher or anyone else notified Warden Hastings or Associate Warden Tucker that the EEO investigator was attempting to reach Plaintiff, and Ms. Butcher's knowledge cannot be imputed to Ms. Hastings or Mr. Tucker. See Bass v. Bd. of Cty. Comm'rs, 256 F.3d 1095, 1119 (11th Cir. 2001) ("It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead the plaintiff must show that the person taking the adverse action was aware of the protected

expression.") Moreover, Plaintiff testified that she never revealed to anyone the substance of her November 2013 phone interview with the EEO investigator.

In addition, Plaintiff attempts to show that Associate Warden Tucker was aware of her protected activity based on his affidavit by interrogatory. (See Doc 63, pp. 6, 11.) Mr. Tucker's affidavit, however, does not indicate whether, and if so when, he had knowledge of Plaintiff's November 2013 protected activity of speaking with the EEO investigator in Mr. Pasley's case. Initially, Mr. Tucker states that he has "[n]o first[-]hand knowledge" of Plaintiff's "prior EEO activity" but explains he was told about an EEO complaint filed by Plaintiff concerning a hiring decision that is not at issue here. (Doc. 60-2, p. 3.) Later, though, Mr. Tucker adds, "Attached is Ms. Windham's [to me] email dated 1/8/14 stating, 'I would like to stay at the FSL.' *I believe* the local Union is behind Ms. Windham's EEO filing." (Id. at p. 7 (emphasis added).) Although unclear, this affidavit indicates Associate Warden Tucker knew prior to July 30, 2014 (the date of Mr. Tucker's affidavit), that Plaintiff had filed an EEO complaint at some time pertaining to work station moves and a hostile work environment, (id. at p. 2). Critically, however, it does *not* show whether Associate Warden Tucker had knowledge of Plaintiff's November 2013 protected EEO statement. Knowledge that Plaintiff had filed a formal EEO complaint concerning transfers and hostility at work does not show knowledge of Plaintiff's statement to the EEO investigator in Mr. Pasley's case. In short, nowhere does Mr. Tucker's affidavit reflect knowledge of Plaintiff's contact with the EEO investigator.

Plaintiff also contends that, based on Associate Warden Tucker's knowledge of her taking prescription medication with emotional side effects—which he learned from Ms. Moody— (doc. 60-2, p. 7), he also knew of her protected activity. (Doc. 63, p. 7 ("It is unlikely that when Defendant's managers were sharing Plaintiff's private, privileged medical information, they were

not also discussing her protected activity and her EEO complaints.").) Plaintiff's speculation here is not probative of whether Mr. Tucker was aware of her protected activity, because knowledge of one's medication does not thereby show knowledge of something else unrelated. To establish causation, the Eleventh Circuit requires more than tenuous theories such as this. See Raney, 120 F.3d at 1197 ("[O]ur cases have required plaintiffs to show a defendant's awareness with more evidence than mere curious timing couple with speculative theories." (citation omitted)). Furthermore, Associate Warden Tucker stated that he was not aware of Plaintiff's protected activity at the subject time, (doc. 60-9, p. 3), and Plaintiff herself testified that Ms. Moody was not aware of her protected activity. Accordingly, Plaintiff's supposition in this regard is without merit.

Finally, Plaintiff contends that both Warden Hastings and Associate Warden Tucker were aware of her protected activity, "because they were notified of the retaliation and took action in response to it." (Doc. 63, p. 11.) Plaintiff does not specify what retaliation she refers to nor does she offer any record citations in support of this allegation. Nevertheless, the evidence of record establishes that, in response to Plaintiff's November 20, 2013 memorandum documenting her dispute with Mr. Wells and the name-calling allegations, Warden Hastings directed Mr. Tucker to hold a meeting with UNICOR staff to emphasize professionalism and demand any name-calling cease. Warden Hastings also reassigned Mr. Wells to a different position, away from where Plaintiff worked. What the evidence fails to establish is that this memo provided notice to Warden Hastings, its recipient, of Plaintiff's protected activity, as it neither expressly mentions retaliation nor indirectly alludes to her protected activity as the genesis of the conduct outlined therein. (See Doc. 60-6.) Moreover, as should be plainly evident, notice of Plaintiff's dispute with Mr. Wells' and of the name-calling issue, which is all that the memo contains, does not thereby provide notice of unmentioned, antecedent protected activity.

Accordingly, for all these reasons, the Court finds that Plaintiff has failed to meet her burden to proffer evidence showing that the relevant decision makers behind her January 21, 2014 transfer were aware of her protected activity. In the face of the undisputed evidence showing that Warden Hastings and Assistant Warden Tucker lacked knowledge Plaintiff provided testimony to an EEO investigator on November 14, 2013, Plaintiff musters nothing which would create a genuine dispute as to this element of her prima facie retaliation case. Thus, in addition to Plaintiff's failure to establish evidence which would allow a jury to find her transfer was a materially adverse employment action, Defendant is due summary judgment on Plaintiff's retaliatory transfer claim for this independent failure to produce evidence indicating that the decision makers at FCI Jesup were aware of her protected activity at the subject time. Kidd, 731 F.3d at 1212 (affirming summary judgment on retaliation claim where the plaintiff did "not offer[] any evidence to show that her [supervisor] was aware of any of her protected complaints, making it impossible for to make out a prima facie case") Therefore, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's claim of retaliatory transfer.[10] (Doc. 60.)

## III.     Plaintiff's Retaliatory Hostile Work Environment Claim

### A.      Legal Standard

The legal standard applicable to retaliatory hostile work environment claims shares the same general framework as retaliatory transfer claims. See Swindle v. Jefferson Cty. Comm'n, 593 F. App'x 919, 926–29 (11th Cir. 2014) (per curiam). However, to make out a prima facie case of retaliatory hostile work environment, also known as a retaliatory harassment claim, a plaintiff

---

[10]  Given that Plaintiff has failed to establish a prima facie retaliation case based on her transfer, the Court declines to delve into whether Plaintiff can show Defendant's proffered legitimate business reasons for her transfer—namely that Wells' removal (pursuant to Plaintiff's complaint) and subsequent replacement left a quality assurance opening at the FSL Factory, that it was common at UNICOR facilities to have the quality assurance specialist work at the smaller factory and the manager work at the larger factory, and that Mr. Cousson's experience was needed at the FCI Factory—were pretext for retaliation.

must offer proof necessary to establish her work environment was hostile and that it existed as a result of her protected activity.  Id. at 928.  Thus, a plaintiff establishes a prima facie case of retaliatory harassment when she shows that: "(1) she engaged in protected activity; (2) after doing so, she was subjected to unwelcome harassment; (3) her protected activity was a 'but[-]for' cause of the harassment; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of her employment; and (5) a basis exists for holding her employer liable either directly or vicariously."  Id. at p. 929 n.10 (citing Gowski v. Peake, 682 F.3d 1299, 1311–12 (11th Cir. 2012); Nassar, 570 U.S. at 360).

When courts evaluate the objective severity of the harassment, they look at the totality of the circumstances and consider the following, among other things: "(1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's job performance."  Gowski, 682 F.3d at 1312 (quoting Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir 2002).  "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  In addition to showing objective severity, the hostile work environment must be one that the plaintiff subjectively perceives to be abusive or hostile.  Miller, 277 F.3d at 1276.

Finally, where the harassing party "is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action.  Id. at 1278.  (citing Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2002).  The plaintiff must therefore show either "actual knowledge" by the employer or "conduct sufficiently severe and pervasive as to constitute constructive knowledge to the

employer." Id. However, if the employer took "immediate and corrective action" it will not be liable for retaliatory harassment, Watson v. Blue Circle, Inc., 324 F.3d 1252, 1261 (11th Cir. 2003), so long as the remedial action is "reasonably likely to prevent the misconduct from recurring." Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996) (citation and internal quotations omitted).

**B.** **Whether Plaintiff Establishes a Prima Facie Case of Retaliatory Hostile Work Environment**

Defendant puts forth several reasons why Plaintiff's claim for retaliatory hostile work environment cannot survive summary judgment: she lacks any evidence that the name-calling followed her protected activity; she lacks enough evidence that her protected activity was the but-for cause of the alleged harassment; her allegations of harassment do not show sufficiently severe or pervasive conduct; and Defendant took prompt remedial action in response to Plaintiff's complaints of harassment. (Doc. 60, pp. 20–26.) In her Opposition Brief, focusing mostly on her transfer claims, Plaintiff does not respond directly to these arguments or assert her case under the applicable legal standard.[11] (See Doc. 63.) As best the Court can discern, with respect to this claim, Plaintiff avers that her dispute with Mr. Wells, the name-calling by co-workers, the actions of Ms. Moody, and her transfer from the FCI Factory, taken together, are sufficient to preclude summary judgment on her retaliatory harassment claim. (See id. at pp. 8, 10.) In his Reply, Defendant counters that Plaintiff conceded this claim by not responding to its "prompt remedial

---

[11] Plaintiff does not cite the correct legal standard for retaliatory hostile work environment claims, as pronounced in Gowski and Harris (and set forth above); instead, she proceeds entirely under Burlington's "dissuade a reasonable employee" standard. (See Doc. 63, pp. 8, 10, 12.) The Eleventh Circuit has held that "to establish a prima facie case of retaliatory harassment, the allegedly adverse actions must meet Harris's rather than [Burlington's] standard." Swindle, 593 F. App'x at 928 (finding that the plaintiff improperly applied Burlington's "materially adverse action standard" to her retaliatory harassment claim rather than Gowski and Harris's "sufficiently severe or pervasive" abuse standard).

action" defense and that she failed to proffer evidence as to the harassers' awareness of her protected activity and the severity and pervasiveness of their harassment. (Doc. 65, pp. 17–20.)

Pretermitting several of the issues raised by these arguments, the Court concludes that Defendant is due summary judgment because the BOP promptly responded with remedial measures to the harassment of which Plaintiff complains. Plaintiff's retaliatory harassment claim is premised upon her dispute and falling-out with Mr. Wells, being called "LT" and "Gestapo," Ms. Moody's comments regarding her work schedule and the whistleblower stunt, and her transfer out of the FCI Factory. As to each of these episodes of alleged harassment, save for her transfer, the undisputed evidence shows that Defendant promptly responded with remedial action each time.

In response to Plaintiff's November 20, 2013 memo, which outlined the name-calling and Mr. Wells' intimidation of Plaintiff, Warden Hastings directed a two-pronged response. First, she assembled a Threat Assessment Team to interview witnesses of Plaintiff's dispute with Mr. Wells and to make appropriate security recommendations. This Team found that Mr. Wells was not an imminent physical danger to Plaintiff, but they recommended that he be reassigned to work in the UNICOR warehouse until further notice. The next day, on November 21, 2013, based on these findings, Warden Hastings reassigned Mr. Wells, and he did not return to work at either the FSL or FCI Factory. Second, with respect to the name-calling, Warden Hastings directed Associate Warden Tucker to conduct a meeting with all UNICOR staff to emphasize the importance of professionalism in the workplace and to demand any name-calling cease, which Mr. Tucker did. As to Ms. Moody's questioning Plaintiff about her overtime and work schedule, there is no evidence that Plaintiff complained about or Defendant responded to this singular, rather innocuous event. However, as to Ms. Moody's whistleblower stunt, where she sarcastically handed Plaintiff a whistle and stated, "A whistle for a whistleblower," while in front of inmates and co-workers,

Warden Hastings responded quickly. Within a day of this stunt, Warden Hastings issued Ms. Moody a formal cease and desist letter regarding her actions against Plaintiff.

Because each of these perpetrators are co-employees of Plaintiff, Defendant cannot be held liable in light of the "prompt remedial action" officials at FCI Jesup took in response to the harassing conduct. See Miller, 277 F.3d at 1278; see also Speigner v. Shoal Creek Drummond Mine, 402 F. App'x 428, 430 (11th Cir. 2010) (per curiam) (no liability on harassment claim where the employer counseled the alleged harasser on his conduct and then moved the employee to a different work crew away from the harasser); Benefield v. Fulton Co., 130 F. App'x 308, 312 (11th Cir. 2005) (per curiam) (no liability on harassment claim where the employer, upon receiving notice of harassment, immediately removed the alleged harassing supervisor and assigned the employee a new supervisor). Here, Defendant took immediate corrective action against Mr. Wells and Ms. Moody's alleged harassment, by removing and issuing a cease and desist respectively within one day's notice of their conduct, as well as against the name-calling by quickly holding a professionalism meeting. Moreover, Defendant instituted an anti-harassment policy that was, based on the evidence, followed promptly and effectively. See Stancombe v. New Process Steel LP, 652 F. App'x 729, 736 (11th Cir. 2016) (per curiam) (anti-harassment policy evidence that employer "took reasonable care to prevent harassment"). Importantly, Plaintiff does not dispute these facts by, for example, showing that the harassment went unabated despite her complaints to Warden Hastings. Plaintiff, in fact, does not rebut Defendant's "prompt remedial action" defense whatsoever. (See Doc. 63; doc. 65, pp. 17–18.) Accordingly, because the undisputed facts show that Defendant took prompt and effective remedial against Plaintiff's co-worker harassers, Defendant cannot be held liable for a retaliatory hostile work environment.

With respect to the last issue, Plaintiff's transfer from the FCI Factory to the FSL Factory, although Defendant did not promptly remedy this action in the sense described above, its failure to do so is irrelevant because, as detailed in Section II. C. *supra*, Plaintiff's transfer cannot support a retaliation claim. Suffice it to say here, because the evidence of record shows that the decision makers behind Plaintiff's transfer, Warden Hastings and Associate Warden Tucker, lacked awareness of Plaintiff's protected activity, her protected activity could not have been a but-for cause of the allegedly harassing transfers instituted by them. <u>Swindle</u>, 593 F. App'x at 929 n.10; <u>see Jarvela</u>, 776 F.3d at 832 (knowledge of protected activity by defendant needed for prima facie showing of retaliation); <u>Higdon</u>, 393 F.3d at 1220 (same). In other words, the discrete act of transferring an employee between factory locations cannot help form the basis of a retaliatory hostile work environment claim when, based on the available evidence, the decision makers have not acted with retaliatory animus in deciding the transfer.

Therefore, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's retaliatory hostile work environment claim. (Doc. 60.)

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant William P. Barr's Motion for Summary Judgment. (Doc. 60.) As such, summary judgment is granted to Defendant on Plaintiff's Title VII retaliation claims for retaliatory transfer and for retaliatory hostile work environment. The Court **DIRECTS** the Clerk of Court to enter summary judgment in favor of Defendant and to **CLOSE** this case.

**SO ORDERED**, this 28th day of March, 2019.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA